1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA ex rel        No    C-04-2068 VRW
     HUANGYAN IMPORT & EXPORT CORP,
12                                                 ORDER
              Plaintiff,
13
              v
14
     NATURE'S FARM PRODUCTS, INC et
15   al,

16            Defendants.
     _____/
17

18

19            This is a suit by the United States (the qui tam relator

20   has been dismissed) under the False Claims Act (FCA), 31 USC § 3729

21   et seq, and the common law against an importer of canned mushrooms

22   and its affiliates.  Following various settlements, only the

23   importer, Nature's Farm Products (NFP) and its officers

24   (collectively, the "NFP defendants") remain in this suit.  The

25   United States alleges that defendants conspired to and did evade

26   customs duties on their imports by falsifying their products'

27   country of origin.  The NFP defendants move pursuant to FRCP

28   12(b)(6) to dismiss the FCA causes of action for failure to state a

United States District Court

For the Northern District of California

claim upon which relief can be granted, advancing purely legal arguments about the reach of the FCA.  Doc #13 (motion to dismiss FCA conspiracy claim); Doc #22 (motion to dismiss FCA substantive claim).  The court sua sponte raised the question of its subject matter jurisdiction in light of United States v Universal Fruits & Vegetables, 370 F3d 829 (9th Cir 2004).  For the reasons that follow, the court concludes that it has jurisdiction over this case, GRANTS the NFP defendants' motion to dismiss the FCA conspiracy claim and DENIES the NFP defendants' motion to dismiss the FCA substantive claim.  Finding that this order resolves controlling questions of law as to which there is substantial ground for difference of opinion, and finding that an immediate appeal from this order may materially advance the ultimate termination of this litigation, the court CERTIFIES this order for interlocutory appeal under 28 USC § 1292(b).


I

     As the motions before the court pose pure questions of statutory interpretation, only the barest recitation of the allegations in the United States' extremely detailed complaint is necessary.  "On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." Wyler Summit Partnership v Turner Broadcasting System, Inc, 135 F3d 658, 661 (9th Cir 1998) (citing Parks School of Business, Inc v Symington, 51 F3d 1480, 1484 (9th Cir 1995)).  The operative complaint in this case was filed by the United States in the Southern District of New York on October 10, 2003; the United States simultaneously filed a motion

2

(which was granted) to dismiss the relator under the FCA's public disclosure bar, see 31 USC § 3730(e)(4)(A).  Apparently due to a docketing error in the Southern District of New York, the file sent to this court upon transfer under 28 USC § 1404(a) did not include the United States' complaint.  To correct the record, the parties have stipulated to the filing of the complaint in this court's docket as Doc #32.  Accordingly, what follows is drawn from that complaint (the "complaint"), taking its allegations as true.

Defendant NFP is an importer of, inter alia, canned mushrooms.  The mushrooms come from Chile, and in late 1998, the International Trade Administration, Department of Commerce (ITA) determined that mushrooms exported from Chile by NFP's Chilean affiliate were being sold at less than fair value ("dumping" in the parlance).  ITA imposed an antidumping duty of 148.51% on NFP's mushrooms.  See Notice of Final Determination of Sales at Less Than Fair Value: Certain Preserved Mushrooms from Chile, 63 Fed Reg 56,613 (ITA Oct 22, 1998).  NFP officers Dennis Choi and Peter Pizzo developed a scheme to circumvent the antidumping duties: They would ship large drums of "brined" (salt-preserved) mushrooms from Chile to Canada; in Canada, with the assistance of defendant Ravine Foods, the mushrooms would be de-brined and packaged in cans for retail sale; these cans -- labeled as products of Canada and so designated in paperwork prepared by defendant Aliments Heritage -- would be imported from Canada into the United States duty-free pursuant to the North American Free Trade Agreement.  Defendant Bank of China, New York Branch (BOCNY) was NFP's commercial bank and was aware of and provided financing for the scheme.

Defendants executed the scheme from late 1998 to mid-

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

2000.  As each shipment of canned mushrooms was presented at the Canada-United States border, defendants submitted to Customs a Customs Form 7501 that designated the "country of origin" as Canada (or the provinces of Quebec or Ontario), and declared that no duty was owed.  Along with the false Forms 7501, defendants submitted false certificates of origin prepared by Aliments Heritage that stated that the mushrooms were products of Canada.  In total, between December 9, 1998, and June 9, 2000, NFP imported approximately 150 falsely labeled shipments of Chilean mushrooms with a declared value of approximately $4.8 million, thus evading antidumping duties of approximately $7.8 million.

A competitor of NFP, relator Huangyan Import & Export ("Huangyan"), uncovered evidence of the scheme during discovery in an apparently unrelated civil lawsuit against NFP.  Huangyan filed this qui tam suit against defendants in the Southern District of New York in 2000; the suit was held under seal until 2003 while the United States decided whether to intervene.  As noted above, the United States did intervene, filed its own complaint and successfully dismissed the relator.  After the United States settled with defendant BOCNY, the case was transferred pursuant to 28 USC § 1404(a) to this district (in which NFP has an office).  At this point, the United States has settled its claims against all but the NFP defendants.

The complaint states four claims:  (1) a violation of 31 USC § 3729(a)(7) ("§ 3729(a)(7)") the substantive FCA provision for so-called "reverse" false claims (which arise when a party avoids an obligation to pay the government, in contrast to claims that seek fraudulently to obtain money or property from the government);

United States District Court

For the Northern District of California

(2) a violation of 31 USC § 3729(a)(3) ("§ 3729(a)(3)"), the FCA's provision governing conspiracies to defraud the government; (3) a claim for common law fraud; and (4) a claim for unjust enrichment. The NFP defendants move pursuant to FRCP 12(b)(6) to dismiss counts (1) and (2) for failure to state a claim upon which relief can be granted.

## II

The court must first consider its own subject matter jurisdiction.  See <u>Steel Co v Citizens for a Better Environment</u>, 523 US 83, 94 (1998).  Generally, the district courts have federal question jurisdiction under 28 USC § 1331 over suits under the FCA. But some matters are carved out from the district courts' original jurisdiction; one such carve-out is found in 28 USC § 1340, which provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for * * * revenue from imports * * * except matters within the jurisdiction of the Court of International Trade."  One statute providing for the exclusive jurisdiction of the Court of International Trade is 28 USC § 1582, which vests exclusive jurisdiction in that court of "any civil action which arises out of an import transaction and which is commenced by the United States * * * to recover customs duties."

The Ninth Circuit has recently held that an FCA suit brought by the United States in the first instance to recover antidumping duties is within the exclusive jurisdiction of the Court of International Trade because (1) it is a civil action, (2) it is "commenced by the United States," (3) the case "arises out of

United States District Court

For the Northern District of California

an import transaction," and (4) the recovery sought constitutes customs duties. <u>United States v Universal Fruits & Vegetables Corp</u>, 370 F3d 829 (9th Cir 2004). <u>Universal Fruits</u> is indistinguishable from the case at bar in all but one respect: <u>Universal Fruits</u> was brought by the United States in the first instance, while the case at bar was originally filed by a relator. This distinction may make a difference, because a suit brought by a relator (who was dismissed) may not be "commenced by the United States" -- thus vesting jurisdiction in this court, not the Court of International Trade. Accordingly, the court must decide whether a FCA suit in which the United States has intervened, filed a complaint and successfully dismissed the <u>qui tam</u> relator is a suit "commenced by the United States" within the meaning of 28 USC § 1582 and <u>Universal Fruits</u>. The court put precisely this question to the parties in asking for supplemental briefing, Doc #31, which the parties have provided, Doc #38 (United States), Doc #39 (NFP defendants).

The question here is difficult because the case at bar lies between two established markers: On the one hand, in <u>Universal Fruits</u>, the Ninth Circuit held that a suit brought in the first instance by the United States is "commenced by the United States" within the meaning of 28 USC § 1582. On the other hand, in <u>United States ex rel Fenton v Allflex USA, Inc</u>, 989 F Supp 259, 263 (CIT 1997), the Court of International Trade held that "a <u>qui tam</u> suit is 'commenced by' the private actor, not the Government." But <u>Fenton</u> is arguably distinguishable from the case at bar because in <u>Fenton</u> the United States had not intervened and the relator was prosecuting the suit; here, by contrast, the United States

6

United States District Court

For the Northern District of California

1  successfully dismissed the relator (Huangyan) under the public

2  disclosure bar of 31 USC § 3730(e)(4)(A), and filed its own

3  complaint.  Because (1) the public disclosure bar of §

4  3730(e)(4)(A) utterly divests courts of jurisdiction over qui tam

5  actions brought on the basis of publicly disclosed information, (2)

6  the United States' complaint supersedes the relator's and (3) the

7  United States is not bound by any action of the relator, see 31 USC

8  § 3730(c)(1), one could fairly argue that the relator's

9  participation was a nullity; that the relator "commenced" this suit

10  only in the sense of docketing the first paper; and that for all

11  practical purposes, the United States "commenced" this suit with

12  its complaint.

13       Against this argument, the United States offers three

14  compelling arguments resting on a detailed textual analysis of the

15  FCA and the Federal Rules of Civil Procedure.  First, "a civil

16  action is commenced by filing a complaint with the court."  FRCP 3

17  (emphasis added).  In some sense, this is the end of the matter:

18  28 USC § 1582 uses the word "commenced" and FRCP 3 defines

19  "commence."  Common sense suggests that an activity (e g, a

20  lawsuit) can only be commenced once, and the relator's filing of

21  its complaint in the Southern District of New York was that

22  commencement.

23       Second, within the qui tam provisions of the FCA, 31 USC

24  § 3730, there is a dichotomy between "private persons" (i e,

25  relators) and "the Government":  The former may "bring a civil

26  action" that is "brought in the name of the Government"; in the

27  FCA, the relator is referred to as "the person bringing the action"

28  or "the person intiating the action."  The United States, by

**7**

United States District Court

For the Northern District of California

contrast, "may elect to <u>intervene</u> and <u>proceed with</u> the action," and by intervening it assumes "the primary responsibility for <u>prosecuting</u> the action." Among the synonyms for "begin," <u>Roget's Thesaurus</u> lists "commence," "bring" and "initiate." ("Commence" and "proceed" are also both synonyms for "arise," but this cluster, which also includes "derive" and "result," seems to be about genesis -- "arise from," "derive from," "proceed from," "commence from" and so on.) And of course, one cannot "intervene" in something that has not previously commenced. In sum, the relator commences the suit; whatever the United States may later do, it does not also commence the suit.

        Third, the government points out that there may be significant practical problems with an interpretation that the United States "commences" an FCA suit by dismissing the relator and filing its own complaint. For one thing, such an interpretation would throw into doubt other areas of law that depend on a certain date of commencement, such as the statute of limitations. Moreover, dismissal of the relator would presumably trigger a mandatory transfer of the case to the Court of International Trade (an inconvenient procedure at best); but the dismissal of the relator would be an interlocutory order subject to reconsideration -- and if reversed, the case would (presumably) be retransferred to the district court. This state of affairs could invite the mischief of "jurisdictional ping-pong" that has on occasion required Supreme Court intervention. See <u>Christianson v Colt Industries Operating Group</u>, 486 US 800, 818 (1988). These conundra do not, on their own, compel the conclusion that a district court has jurisdiction over a <u>qui tam</u> FCA suit like this from start to

United States District Court

For the Northern District of California

finish, but they lend credence to the notion that Congress did not intend commencement to be a fluid concept.

In sum, the United States has the better of the argument on several different levels:  An FCA qui tam action in which the relator has been dismissed and the United States has filed a complaint is not "commenced" by the United States within the meaning of 28 USC § 1582.  Accordingly, the court concludes that the Court of International Trade would not have subject matter jurisdiction over this action.  Therefore, this court has subject matter jurisdiction and proceeds to consider the merits.

### III

In turning to the substantive questions raised in the NFP defendants' motions to dismiss, an overview of the FCA's legislative history is helpful.  The FCA was originally enacted during the Civil War and later codified at Rev Stat § 3490 (civil penalties for false claims), which incorporated by reference the substantive offenses of Rev Stat § 5438 (criminal penalties for false claims).  Rev Stat § 5438 provided that:

> any person not in the military * * * who shall make or cause to be made, or present or cause to be presented, for payment or approval, * * * any claim upon or against the Government of the United States * * * knowing such claim to be false, * * * or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim * * * shall [be liable to the United States].

Aside from recodifications, there have been only two amendments relevant to this case:  First, the conspiracy provision was amended

United States District Court

For the Northern District of California

by Pub L No 97-258, 96 Stat 978 (1982), to provide simply that "[a]ny person who * * * (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" is liable to the United States.  31 USC § 3729(a).  The meaning of "claim" is further clarified in 31 USC § 3729(c).

The second amendment to the FCA was in response to a perceived lacuna in the statute:  As written, it covered only false claims (i e, affirmative demands on the treasury); it did not clearly reach false statements that avoided an obligation to make a payment to the United States.  See <u>United States v Bornstein</u>, 423 US 303, 309 n4 (1976) (suggesting in dictum that the pre-1986 version of FCA did not reach reverse false claims); <u>United States v Howell</u>, 318 F2d 162 (1963) (holding that the pre-1986 version of FCA did not reach reverse false claims); False Claims Amendments Act of 1986, S Rep No 345, 99th Cong, 2d Sess 15 (1986), 1986 USCCAN 5266, 5280 (discussing Department of Justice testimony before Congress that "recent court rulings had produced an ambiguity as to whether * * * 'reverse false claims' were covered by the False Claims Act").  Such claims are "reverse" false claims, because the financial obligation that is the subject of the fraud flows in the opposite of the usual direction.

To address this gap, Congress amended the FCA in 1986, see Pub L No 99-562 § 2, 100 Stat 3153 (1986), by adding subsection (7) to 31 USC § 3729(a), which imposes liability on any person who "knowingly makes * * * a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 USC § 3729(a)(7).

/

United States District Court

For the Northern District of California

1

A

2          With this legislative history in mind, the court first

3 considers the NFP defendants' motion to dismiss the substantive FCA

4 claim under § 3729(a)(7).  Mot Dismiss (Doc #22).  The NFP

5 defendants contend that "a claim under 31 USC § 3729(a)(7) for

6 avoidance of an obligation to pay money to the government[] must be

7 based on a <u>present, existing legal duty to pay the government a</u>

8 <u>fixed sum of money when the alleged false statement is made</u>.  * * *

9 The customs duties, including anti-dumping duties, attach at the

10 time goods (such as mushrooms) are trucked over the border from

11 Canada [which] is <u>at the same time</u> that the alleged false

12 statements or records, namely Customs Form 7501 and the

13 Certificates of Origin were submitted to the United States Customs

14 Service."  Def Mot (Doc #22) at 2:4-12.  In short, the NFP

15 defendants argue that the "obligation" of § 3729(a)(7) must

16 preexist the "false record or statement" of that subsection.

17          There being no on-point authority from the Ninth Circuit,

18 the NFP defendants cite out-of-circuit authority for their

19 argument:  <u>United States ex rel Bain v Georgia Gulf Corp</u>, 386 F3d

20 648 (5th Cir 2004) ("<u>Bain</u>"); <u>American Textile Manufacturers</u>

21 <u>Institute, Inc v The Limited, Inc</u>, 190 F3d 729 (6th Cir 1999)

22 ("<u>ATMI</u>"); and <u>United States v Q International Courier</u>, 131 F3d 770

23 (8th Cir 1997) ("<u>Quick</u>").  The NFP defendants can indeed point to

24 language in each of these opinions that, as a literal matter,

25 supports their position that the "obligation" of § 3729(a)(7) must

26 preexist the "false record or statement.  But their argument is

27 sophistry:  Each of the cases is factually distinguishable and,

28 more importantly, the reasoning of <u>Bain</u>, <u>ATMI</u> and <u>Quick</u> does not

United States District Court

For the Northern District of California

support the result that the NFP defendants would have the court reach in this case.

Quick, the oldest of the three cases, concerned a mail courier engaged in a remailing scheme:  The courier (Quick) would ship mail in bulk to Barbados, where postage would be paid to Barbados to deliver the letters to destinations in the United States.  Because Barbados' international postal rates were significantly lower than United States domestic postal rates, the scheme saved postage costs for Quick's customers.  Because the United States Postal Service typically delivers inbound international mail for free under the Universal Postal Convention (in reciprocity with the national postal carriers in foreign states), the Postal Service was not paid for domestic delivery of Quick's letters.

The Eighth Circuit began its discussion of the FCA by offering a holding couched in temporal terms: "To recover [for a reverse false claim] under the False Claims Act, we believe that the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to made or used."  Quick, 131 F3d at 773.  The broad strokes of this support the NFP defendants' position.  But the court went on to explain its holding in terms of the source of the obligation:

> The obligation cannot be merely a potential liability; instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness

Id.

United States District Court

For the Northern District of California

1    From here, the court's discussion makes clear that the

2  emphasis is not so much on the *timing* of the obligation as on its

3  *source*.  Consistent with this focus, the court worked through the

4  statutory and regulatory sources that might have imposed an

5  obligation on Quick to pay domestic postage as part of its

6  remaining scheme.  Finding no source for the "obligation," the

7  Eighth Circuit affirmed the district court's grant of summary

8  judgment.  The situation here is rather different, for the United

9  States has identified the source of an obligation to pay duties on

10  certain Chilean mushrooms:  the ITA's final order (cited above) and

11  the attendant regulatory framework authorizing and implementing the

12  assessment and collection of such antidumping duties.

13    The *Quick* court acknowledged that a certain postal

14  regulation might authorize the assessment of a penalty against

15  Quick for encroaching on the Postal Service's statutory monopoly,

16  but promptly explained that "[a] potential penalty, on its own,

17  does not create a common-law debt.  A debt, and thus an obligation

18  under the meaning of the False Claims Act, must be for a fixed sum

19  that is immediately due.  [The] regulation merely provides a range

20  of penalties that might be assessed; it does not create an

21  immediate duty to pay a specific sum."  Id at 774.  This court

22  agrees with the Eighth Circuit (and, as will shortly be seen, the

23  Fifth and Sixth Circuits in Bain and ATMI, respectively) that

24  potential obligations -- fines, penalties and the like -- that are

25  contingent upon the exercise of some discretion or intervening act

26  by the government are not properly the subject of a suit under the

27  FCA.

28    The existing debts / contingent penalties dichotomy

United States District Court

For the Northern District of California

frames -- but does not answer -- the relevant question in this case:  On which side of the line is the customs duty allegedly owed by the NFP defendants?  The United States contends that the legal obligation to pay the antidumping duty existed upon the ITA's issuance of its final order respecting NFP's Chilean mushroom imports, and that "customs officials exercise no discretion at all with respect to antidumping duties, but simply apply the 148.51% established by the [ITA final order] to determine the duties owed.  Pl Opp (Doc #23) at 9:22-24 (citing United States v Yuchius Morality Co, 2002 WL 31357050, *3 (CIT)).  This argument squarely places the duties at issue in the "existing debts" category -- albeit a subcategory in which payment is contingent upon importation.  The NFP defendants do little to dispute the determinacy with which the Customs Service operates; they respond that the duties at issue belong in the "contingent penalties" category because of the contingencies of (1) actual importation and (2) determination by the Customs Service that the mushrooms are in fact covered by the ITA final order.  See Def Reply (Doc #25) at 5:15-6:2.  The latter is a relevant contingency only if the Customs Service has discretion in designating the origin of an import.  But there is no suggestion here that the Customs Service had such discretion.  Importation is a contingency in the control of the importer; there is no discretion to be found in the hands of some government official.

        This distinction is borne out in the two other courts of appeals decisions relied on by the NFP defendants.  Bain concerned alleged violations of state and federal air quality laws by an industrial chemical manufacturer.  These violations -- which would

**14**

United States District Court

For the Northern District of California

have been known to regulatory authorities had the manufacturer not falsified its pollutant reports -- were sufficient to allow those regulatory authorities to assess fines and penalties against the manufacturer.   Relator Bain argued that a potential fine or monetary penalty should be interpreted as an "obligation" within the meaning of § 3729(a)(7).   386 F3d at 653-56.   The Fifth Circuit rejected this argument:

> [T]he reverse false claims act does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted) and which do not arise out of an economic relationship between the government and the defendant * * *. * * * [Defendant], in common with all others, was obligated to obey the law, including the Clean Air Act and the regulations pursuant thereto, and if it did not it could be subjected (as alleged in the amended complaint) to "statutory fines and penalties", but the mere contingent potential that such fines or penalties might be (but had not been) sought and imposed does not constitute "an obligation to pay or transmit money or property to the Government" within the meaning of section 3729(a)(7).

Id at 657-58.

Compared to Quick and Bain, the putative obligations in ATMI are in most respects equally distinguishable from the obligations in the instant suit.   In that case, ATMI contended that the defendant clothing importers "engaged in a pattern or practice of trade pursuant to which articles of apparel produced in the People's Republic of China [were] transhipped to Hong Kong or Macau; and [were] knowingly represented to be the products of Hong Kong or Macau in official entry documents [submitted to the Customs Service] by or on behalf of [the] defendants."   ATMI, 190 F3d at 731.   Unlike the case at bar, there were no antidumping duties at

issue in **ATMI**, but ATMI did appeal to a number of statutes authorizing penalties for the defendants' alleged practices as establishing an "obligation" under § 3729(a)(7).  See **ATMI**, 190 F3d at 732 (citing 18 USC § 545 (prohibiting smuggling and false customs documents); 19 USC § 1595a(b) (penalizing importation of goods "contrary to law"); 19 USC § 1592 (penalizing false statements in connection with importation); 19 USC § 1623 (relating to customs bonds); 19 USC § 1304(h) (imposing a 10% duty on goods bearing false country-of-origin markings); 15 USC §§ 45(n), 70a(a), 70b(b)(4) (deeming misbranding of textiles to be unfair competition)).

The **ATMI** court adopted the reasoning of the Eighth Circuit in **Quick**.  190 F3d at 736.  Based on this, it was easy to reject most of the putative obligations as "rely[ing] on the theory of contingent obligations" because they depended on the exercise of governmental discretion to seek a fine or penalty, or, in the case of the bonding requirement, were contingent upon the government requiring a bond in the first instance, which it had not.  Id at 741.  Indeed, the provision penalizing the making of false statements to the Customs Service, 19 USC § 1592, seems an especially inappropriate basis for a suit under the FCA because not only is the penalty contingent on government enforcement, but also liability only arises because of the false statement itself.

For the **ATMI** court, the allegation that "the defendants filed false documents to conceal liability under 19 USC § 1304(h) present[ed] the most difficulty, as it involves a provision applying a ten percent ad valorem marking duty to goods having false country-of-origin markings."  190 F3d at 741.  In other

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

words, the United States will permit the importation of mismarked
goods (subject to other penalties, perhaps) upon payment of an
additional 10% ad valorem duty (the "mismarking duty").  This seems
at first blush legally indistinguishable from the case at bar:  In
ATMI the defendants allegedly lied about the country of origin to
conceal their obligation to pay a readily computable sum (i e, 10%
of the value of the imported textiles); here, the NFP defendants
allegedly lied about the country of origin to conceal their
obligation to pay a readily computable sum (i e, 148.51% of the
value of the imported mushrooms).  The NFP defendants correctly
point out that the ATMI court adopted their view in rejecting the
position that the mismarking duty is an "obligation" within the
meaning of § 3729(a)(7).

The court is not entirely confident that it comprehends
the Sixth Circuit's reasoning in ATMI, but it seems to rest on
three related aspects of the mismarking duty:  First, the ATMI
court noted that the mismarking duty applies "when a defendant
engages in conduct that the statute defines as wrongful."  190 F3d
at 741 (emphasis added).  Second, ATMI depends very heavily on a
Federal Circuit case interpreting the mismarking duty provision to
require a mens rea.  See ATMI, 190 F3d at 741-42 (quoting Pentax
Corp v Robison, 125 F3d 1457, 1463 (Fed Cir 1997).  Third, ATMI
pointedly quotes Pentax's note that mismarking duties arise not at
the time of mismarking, but rather upon the would-be importer's
subsequent "failure to export, destroy, or remark the articles in
accordance with [the law]."  ATMI 190 F3d at 741-42 (quoting
Pentax, 125 F3d at 1463).

The court is unsure why the labeling of conduct as

17

United States District Court

For the Northern District of California

"wrongful" or attaching a <u>mens rea</u> requirement are relevant to whether a customs duty can be the subject of an FCA claim, but in any event, neither aspect is present for the antidumping duties here at issue:  The antidumping duty is not assessed because importation is "wrongful"; it is simply the price of bringing certain products into the United States.  As for the <u>mens rea</u> requirement, there is apparently no analogue to <u>Pentax</u> in the antidumping duty context, and there is no independent suggestion by the parties that a <u>mens rea</u> requirement attaches to the antidumping duties.  Finally, <u>Pentax</u>'s comment about the importer's "failure to export, destroy, or remark" has no parallel here.  The importer of goods subject to antidumping duties has no opportunity to remedy his false statement in the way that an importer of mismarked goods can subsequently re-mark the goods.  Indeed, there is no way <u>at all</u> to "cure" the fact that the mushrooms come from Chile; a mismarked product can be re-marked, but Chilean mushrooms will always be Chilean.  Facing such distinctions, the court will not follow <u>ATMI</u> on this issue.

This leaves the court with the simple dichotomy identified above:  There are obligations that are certain (or nondiscretionary and readily computable) and there are fines and penalties contingent on governmental discretion, and the putative obligation in this case falls in the former category.  Accordingly, because the NFP defendants have failed to explain what was contingent or discretionary about the assessment of the antidumping duties alleged in the complaint, their motion to dismiss the first claim (Doc #22) is DENIED.

/

**B**

The court next takes up the NFP defendants' motion to dismiss the FCA conspiracy claim under§ 3729(a)(3).  Mot Dismiss (Doc #13).  Section 3729(a)(3) holds liable persons who "conspire to defraud the Government by getting a false or fraudulent claim allowed or paid."  The NFP defendants' argument is a simple syllogism:  By its express terms, § 3729(a)(3) does not reach conspiracies to make reverse false claims.  The complaint describes a reverse false claim conspiracy -- specifically, a plan to avoid paying customs duties.  Ergo § 3729(a)(3) does not reach the conspiracy described in the complaint.

Admittedly, this creates an unusual lack of symmetry in the FCA's structure:  Normal and reverse false claims are equally punishable as a substantive matter, but only conspiracies directed at the former, not the latter, are punishable.  But the NFP defendants' logic is unassailable.  As this court has previously explained in interpreting another provision of the FCA:

> Courts engaged in statutory interpretation should presume that "if the language of a statute is clear and there is no ambiguity, then there is no need to 'interpret' the statute by resorting to legislative history."  <u>Church of Scientology v United States Dep't of Justice</u>, 612 F2d 417, 421 (9th Cir 1979).  The reasoning behind this so-called "plain meaning rule" is that "in the vast majority of its legislation Congress means what it says and thus the statutory language is normally the best evidence of congressional intent."  Id.

<u>United States ex rel Costa v Baker & Taylor, Inc</u>, 1998 WL 230979, *7 (ND Cal) (Walker, J).  The requirement that the conspiracy be directed at "getting a false or fraudulent claim allowed or paid," § 3729(a)(3) is unambiguous:  Its plain meaning requires that the

United States District Court
For the Northern District of California

19

conspirators seek to be "paid" or to have a claim on the treasury "allowed."  That is not what allegedly happened here; the alleged conspirators in this case wanted to avoid paying money to the United States.

Nor is the definition of "claim" in § 3729(c) any help to the United States.  That section -- which merely expands the scope of "claim" to include claims made on agents or intermediaries of the United States -- does nothing to sweep reverse false claims within the meaning of "claim":

> For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 USC § 3729(c).  Thus, neither in the pertinent subsection itself, nor in the statute's definitions is there any way to shoehorn reverse false claim conspiracies into § 3729(a)(3).

Moreover, the court is mindful that (1) the Ninth Circuit interpreted the pre-1986 FCA not to reach reverse false claims, see Howell, 318 F2d 162; (2) the conspiracy provision, § 3729(a)(3), has not been meaningfully altered since Howell; and (3) the conspiracy provision was untouched by the 1986 amendments made by a Congress quite aware of the distinction between normal and reverse false claims.  In that light, Howell is arguably still good law with respect to § 3729(a)(3), and this court is obliged to conclude that § 3729(a)(3) does not reach conspiracies to make reverse false claims.  This interpretation is in accord with the only other

federal case squarely to address this issue.  See <u>United States ex</u>
<u>rel Atkinson v Pennsylvania Shipbuilding Co</u>, 255 F Supp 2d 351,
413-14 (ED Pa 2002).

The United States's opposition (Doc #19) largely misses
the point of the NFP defendants' motion regarding the conspiracy
claim.  For example, the United States contends that the "obvious
problem with the argument of the NFP Defendants that a <u>conspiracy</u>
<u>to submit a reverse false claim</u> requires 'actual payment' is that
reverse false claims, by their nature, do not involve an 'actual
payment.'"  Pl Opp (Doc #19) at 9:26-10:1 (emphasis added).  But
the NFP defendants' argument is that <u>§ 3729(a)(3)</u> requires actual
payment (or a demand seeking actual payment), and thus does not
reach reverse false claims -- which, indeed, do not involve actual
payment.  Moreover, the United States pays disturbingly little
attention to the wording of the subsections of § 3729(a) when it
argues:

> The NFP Defendants also argue that the
> definition of "claim" in § 3729(c) precludes
> liability for anything other than a demand for
> money or property.  Yet if this argument were
> true, there would never be <u>any</u> liability for
> reverse false claims, which by their nature do
> not involve a demand for money or property.  By
> this interpretation, "reverse false claims" are
> not "claims" at all.  The NFP Defendants cannot
> interpret one provision of the False Claims Act
> (§ 3729(c)) to render a separate provision (§
> 3729(a)(7)) a nullity.

Pl Opp (Doc #19) at 15:3-8.  The argument is that subsection (a)(7)
-- the provision of the FCA that indisputably reaches reverse false
claims -- relies on "claim" including reverse false claims, and
therefore "claim" elsewhere in the statute must include reverse
false claims.  But the premise of the argument is demonstrably

false:  Nowhere in its thirty-two words does subsection (a)(7) refer to "claims."  The government could not have put it better: "'reverse false claims' are not 'claims' at all."  Pl Opp (Doc #19) at 15:6-7.

The United States also spends a great deal of effort attempting to persuade the court that failing to impose liability on a reverse false claim conspiracy is at odds with its drafters' intent.  The resort to legislative history is inappropriate and unavailing.  As an initial matter, "to disregard the plain meaning of [a] statute," a court must first "conclude that the result [of a plain meaning reading" is either absurd or would lead to internal inconsistency."  Coronado-Durazo v INS, 123 F3d 1322 (9th Cir 1997) (citing United States v Turkette, 452 US 576, 580 (1981)).  While the court is sympathetic to the United States' commonsense point that there is very little difference in economic terms between conspiring to make a false claim on the United States and conspiring to avoid paying money to the United States, this result is not self-contradictory and it is hardly "absurd".  After all, the FCA did not cover reverse claims at all for the first 123 years of its existence; while that might have been bad policy, surely it was not absurd.  Even if resort to legislative history were permissible here, the United States appeals to Congress' intent in enacting § 3729(a)(7) -- which is not at issue here.  The legislative history of subsection (a)(7) can hardly change the meaning of the previously enacted subsection (a)(3).  The short of it is that if Congress in 1986 wanted to include reverse false claim conspiracies in the FCA, it failed to enact any statutory language to that effect.  It is not up to this court to do what

22

United States District Court

For the Northern District of California

Congress could have done but did not.

Finally, the United States cites two district court cases that suggest that reverse false claim conspiracies are actionable under § 3729(a)(3).  See <u>United States ex rel Capella v Norden Systems, Inc</u>, 2000 WL 1336487, *11 (D Conn); <u>United States ex rel S Prawer & Co v Verrill & Dana</u>, 962 F Supp 206, 208 n2 (D Me 1997). But those cases' discussions about reverse false claim conspiracies are dicta (and unconsidered dicta at that).  The court is far more persuaded by the foregoing analysis and the analysis in <u>Atkinson</u>, a case that -- in its holding, not its dictum -- addressed the question presented here.

Accordingly, the court concludes that 31 USC § 3729(a)(3) does not reach conspiracies to make reverse false claims.  As the allegations of the complaint are now, and always have been, exclusively directed toward reverse false claims, the NFP defendants' motion to dismiss the second claim under 31 USC § 3729(a)(3) (Doc #13) is GRANTED.  Futhermore, because there has been no suggestion that defendants conspired to make a normal false claim on the United States, amendment of the complaint would be futile.  <u>DCD Programs, Ltd v Leighton</u>, 833 F2d 183, 186 (9th Cir 1987).  Accordingly, the United States is DENIED leave to amend this claim.

III

This order resolves three pure questions of law on which there is no on-point precedent from the Ninth Circuit.  As the foregoing discussion suggests, there are reasonable grounds for disagreement on each of these three issues.  Indeed, the court

United States District Court

For the Northern District of California

candidly acknowledges its partial disagreement with the Sixth Circuit's decision in ATMI, so reasonable jurists might not reach the conclusions that has this court.  These issues go to the heart of the case:  Depending on how the three issues are resolved, the United States might have two FCA claims, one FCA claim, no claim at all or might be in the wrong court altogether.  This order itself is a "split decision" on the merits issues.  Furthermore, the stakes are large -- after trebling and civil penalties, there are tens of millions of dollars in controversy.  And while the United States maintains that it will require relatively little further discovery, the NFP defendants represent that they anticipate taking discovery outside of the United States, a sometimes onerous task.

For these reasons, the court is of the opinion that certification of this order for interlocutory appeal under 28 USC § 1292(b) is appropriate:  It involves three controlling questions of law as to which there are substantial grounds for difference of opinion, and immediate appellate review of those questions may materially advance the termination of the litigation (whether by dismissal, compromise or transfer for want of jurisdiction).  Accordingly, this order is CERTIFIED for interlocutory appeal.  As this order resolves issues against both parties, either party may apply to the Court of Appeals for the Ninth Circuit to accept certification.  Should the Ninth Circuit accept certification, the parties shall confer and within 30 days submit to the court a proposal for whether this action should be stayed pursuant to the proviso of 28 USC § 1292(b).  In the event the Ninth Circuit declines to accept certification, the parties are directed to so inform the court promptly and request a case management conference.

## IV

In sum, the court GRANTS the NFP defendants' motion to dismiss the FCA conspiracy claim (Doc #13) and DENIES the NFP defendants' motion to dismiss the FCA substantive claim (Doc #22). This order is CERTIFIED for interlocutory appeal pursuant to 28 USC § 1292(b).

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge